2026 IL App (1st) 250485-U
No. 1-25-0485

SIXTH DIVISION
August 7, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21 CR 14387 |
| | ) | |
| NIQUITA BOOKER, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Ursula Walowski, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice C.A. Walker and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held:* Defendant's attempted first degree murder conviction is reversed and remanded for a new trial where the jury was improperly instructed on the *mens rea* element of the offense. Defendant's second degree murder conviction is affirmed over her contentions that the State failed to prove her guilt beyond a reasonable doubt and her sentence was excessive.

¶ 2    Following a jury trial, defendant Niquita Booker was found guilty of attempted first degree murder (720 ILCS 5/8-4(a) (West 2020), 9-1(a)(1) (West 2020)) and second degree murder (*id*. § 9-2(a)(2) (West 2020)). She was sentenced to consecutive terms of 26 years' and 10 years' imprisonment, respectively. On appeal, defendant contends that the State failed to prove the

offenses beyond a reasonable doubt because it did not disprove that defendant reasonably believed that she needed to use deadly force during the incident. She also contends that the defendant's trial counsel was ineffective for failing to object to the jury instruction for attempted first degree murder which did not specify that defendant intended to kill without lawful justification. Finally, defendant challenges her sentences by asserting that (1) the evidence established she acted under a serious provocation, necessitating that her attempted murder conviction be sentenced as a Class 1 offense; and (2) the trial court failed to consider the mitigating factors in sentencing her for second degree murder. For the following reasons, we affirm in part and reverse and remand in part.

¶ 3                                    I. BACKGROUND

¶ 4        Defendant was charged by indictment with eight counts of the first degree murder of Kailah Bledsoe with a firearm (720 ILCS 5/9-1(a)(1)-(2) (West 2020)), three counts of the attempted first degree murder of Kenneth Bledsoe with a firearm (*id*. § 9-1(a)(1) (West 2020); *id*. § 8-4(a) (West 2020)), three counts of the attempted first degree murder of Antwan Harrison with a firearm (*id*. § 9-1(a)(1) (West 2020); *id*. § 8-4(a) (West 2020)), and two counts of aggravated discharge of a firearm (*id*. § 24-1.2(a)(2) (West 2020)). As Kailah and Kenneth Bledsoe share the same surname, we will refer to them by their first names. The charges arose from events on October 31, 2021, wherein defendant allegedly discharged a firearm at Kailah, Kenneth, and Harrison, resulting in Kailah's death.

¶ 5        Prior to trial, defendant asserted that she would be relying on the affirmative defense of self-defense, and filed a motion pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984) to admit evidence of the victims' violent character. The court granted the motion in part and denied it in part.

¶ 6                                    B. Jury Trial

¶ 7          The matter proceeded to a 2024 jury trial on two counts of first degree murder and one count of the attempted first degree murder of Kenneth. At trial, Kenneth testified that Kailah was his daughter, and she was 21 years old when she was killed. She lived with Kenneth during the incidents at issue. Kenneth and defendant dated from February 2021 to approximately September 2021. They mutually decided to end their relationship because they "were not good together." After ending the relationship, Kenneth's relationship with defendant was "antagonistic."

¶ 8          On October 31, 2021, Kailah and Harrison went to the store while Kenneth was at home. Approximately "less than a minute" later, Kenneth "heard a commotion" outside which included Kailah's voice. Kenneth then relocated to the alley and saw Kailah, Harrison, defendant, defendant's brother, and another man. Kenneth said "come back here, Kailah" as Kailah and Harrison walked into the alley and approached a blue vehicle, which Kenneth knew belonged to defendant's brother. Kailah stopped near the blue vehicle. Defendant then shot Kailah "[i]n the face" twice, after which Kenneth attempted to approach Kailah. Defendant then "turned the [firearm] on" Kenneth and shot at him three times. Kenneth, Kailah, and Harrison were not holding anything. After defendant shot Kailah, she entered the blue vehicle and drove from the scene.

¶ 9          On cross-examination, Kenneth denied abusing defendant but stated that defendant served him with an order of protection. Kenneth also stated that Kailah had not "beat[en] up" any of his ex-girlfriends. He denied "yucking it up" with Kailah and Harrison about the number of times Kailah had "beaten up" his ex-girlfriends. Kenneth and defendant had broken up several times during their relationship. Kenneth denied owning a firearm or showing defendant a firearm.

¶ 10         On September 12, 2021, the day before the order of protection was entered against Kenneth, defendant wished to permanently end the relationship. Kenneth denied responding, "[i]f

you do that, I'm going to stalk you until I kill you." Kenneth stated that defendant obtained an order of protection against him because she "stole" his vehicle and attempted to hinder his efforts to take it back. Defendant lived in the apartment above Kenneth's, and the following day, sent him a text message containing a video of her "trashed" apartment. Kenneth proceeded upstairs and defendant "came at" him with a knife. Kenneth denied that defendant asked him to leave before brandishing the knife.

¶ 11        Carl Gholston testified that during the day of the incident he was a driver for Uber. At approximately 10:30 a.m., he dropped off a passenger in the alley next to her apartment building, near the intersection of West 76th Street and Morgan Street in Chicago. When Gholson drove into the alley, he saw a "young man and woman" on the sidewalk near the mouth of the alley and a blue vehicle in the alley approximately fifteen feet in front of his vehicle. Three people were inside the blue vehicle.

¶ 12        Defendant, whom Gholston identified in court, exited the blue vehicle along with two young men. They walked to the back of the blue vehicle. Then, the "young man and woman" walked into the alley. Defendant and the other woman, who was holding a cigarette, "exchang[ed] words." As the other woman approached the blue vehicle, defendant reached into the vehicle, removed a firearm, and pointed it at the other woman. Defendant fired "two shots," and the other woman fell to the ground with blood on her face. "[A]t some point," another man entered the alley and approached the scene. When the man arrived "it was like panic," and defendant discharged her firearm "his way." At that point, Gholston reversed and exited the alley. Gholson's vehicle was equipped with a dashboard camera facing outward, and it recorded the incident. The footage was published. It is a part of the record on appeal and has been viewed by this court.

¶ 13  The footage, which does not contain audio, depicts Gholston arriving at the alley. As he enters the alley, Kailah and Harrison are standing on the right side of the sidewalk near the entrance. A blue vehicle is parked halfway down the alley, and a man exits the right passenger side of the vehicle. Defendant exits the driver's seat, at which point Kailah and Harrison slowly walk toward her. Kailah's left hand is on her hip. Kenneth approaches behind Kailah and Harrison. As Kailah nears the vehicle, defendant reaches into the vehicle and removes an object. She points it at Kailah, who falls to the ground between defendant and the camera. Kenneth moves in the direction of Kailah, and defendant points the object at him. Kenneth and Harrison flee the alley, and Gholston reverses his vehicle and drives from the scene. Approximately 22 seconds lapse from when defendant exits the vehicle to her discharging the firearm at Kenneth.

¶ 14  Joseph Booker, defendant's brother, testified that, on October 31, 2021, he had loaned his vehicle to defendant, and she drove him to her apartment where she planned to unload groceries.[1] A third man, whom Joseph did not know, was in the back seat, but Joseph did not know the man's actions during the incident. As defendant neared her apartment building's alley, Kailah stood on a nearby sidewalk and addressed defendant. Defendant responded "what's up"; Joseph stated that defendant was not angry. Defendant parked in the alley, and Joseph exited the vehicle to assist with carrying groceries.

¶ 15  After Kailah neared defendant, passing Joseph, he heard gunshots, and Kailah fell. Joseph was not concerned "for himself," but the situation unfolded very quickly and "a lot" was happening. He did not recall whether he saw defendant discharge the firearm but saw her with the firearm afterward. Joseph attempted to call the police but was unable to do so. Then, Joseph and defendant entered the blue vehicle again, and defendant drove from the scene. Joseph

---

[1] As defendant and her brother share the same surname, we will refer to him by his first name.

"panick[ed]," "lash[ed] out" at defendant and asked her what had happened, and defendant cried saying she didn't know. She said "I know. I know. I'm sorry. I'm sorry. I don't know. I don't know. I just lost it." Defendant was shaking and seemed afraid. Defendant drove to an area near Joseph's house, where she and the other man "jump[ed]" from the vehicle, leaving Joseph alone. Joseph then drove to his mother's house.

¶ 16    On cross-examination, Joseph stated that when he first observed Kailah, she was walking from the alley to the corner of the street. Later, Joseph saw her return into the alley "so quick[ly]" that he thought she ran at them. The shooting was "very upsetting" to Joseph, and defendant was also "crying" and "hysterical" after the incident. Joseph did not hear Harrison say anything, but he had a hand in his pocket as he walked closer to the vehicle.

¶ 17    On redirect examination, Joseph testified that he asked defendant how she could "do this" in his vehicle, after which she responded "I know. I know. I'm sorry. I'm sorry. I don't know. I don't know. I just lost it."

¶ 18    Evidence Technician Salvatore Sammartino testified that on October 31, 2021, he traveled to the scene where he observed no fired evidence. He photographed the scene and recovered items from the medical examiner's office, including two projectiles recovered from Kailah's body, which he inventoried.

¶ 19    The State introduced a stipulation that Kailah's remains were transported to the Cook County Medical Examiner's Office where Dr. Escobar Alvarenga performed a postmortem examination. If called, Dr. Alvarenga would testify that the cause of Kailah's death was multiple gunshot wounds to her face, and the manner of death was homicide.

¶ 20    Defendant testified that she met Kenneth on February 14, 2021, in their shared apartment building. They began dating approximately two weeks later. Defendant described the relationship

as "fine" in the beginning, but it became verbally and physically abusive over time. Kenneth "choke[d]" her, "tackle[d] [her] into the couch," and bit and punched her face. As a result, defendant sustained a "really huge knot" on her forehead, and "a busted lip and bite marks." Defendant and Kenneth would end the relationship after these fights but would resume the relationship soon thereafter. Defendant testified that she broke up with Kenneth "at least *** seven times." In May 2021, Kenneth showed defendant a firearm.

¶ 21    In June 2021, defendant conversed with Kenneth, Kailah, and Harrison in Kenneth's apartment. During this conversation, Kailah spoke "about how she used to fight all [Kenneth's] ex-girlfriends" and "win." The topic was "very humorous to her." Kenneth, Kailah, and Harrison were "all laughing" about it. After hearing this, defendant became afraid and distanced herself from Kenneth.

¶ 22    On September 12, 2021, defendant ended her relationship with Kenneth definitively. Kenneth was upset and told her that if she left him, "he will stalk [her] for the rest of [her] life and he will kill [her]." Defendant returned to her apartment, and "less than three minutes later," heard a banging sound on her door. Kailah stood outside her apartment kicking and banging on the door. She told defendant to give Kenneth his keys, and she would find defendant and "beat [her] up." Defendant called the police, but they never sent a police vehicle to investigate. Later that day, Kailah sent defendant threatening Facebook messages and attempted to call her. After the last message, defendant blocked Kailah.

¶ 23    A screenshot of the Facebook messages was published to the court. The screenshot is a part of the record on appeal and has been viewed by this court. The screenshot shows the following messages sent by Kailah:

        "I'm here where you at

You want me to come get you??

You need help finding your way??

[Missed video chat]

Yooo don't get scared now wya

[Missed audio call]

Lmao here I come baby

Wya lil mama I'm at yo door

Yo punk a*** b*** you do allay lip boxing straight BARKING you bird a*** b***

where tf you at I'll come to you drop lo ho

Aaaaaaaahhhhhhh you a f*** punk b***

I see you done met the right b***"

¶ 24        Defendant returned to her apartment at 10:30 that night and saw that it was "in shambles." The door had been taken off its hinges, and many of her belongings were destroyed. Defendant recorded a video of the apartment, which she sent to Kenneth. Kenneth went to defendant's apartment but subsequently refused to leave despite her requests that he do so. Defendant only left after she threatened him with a knife. She also called the police.

¶ 25        On September 13, 2021, defendant filed a petition for an order of protection, which the court granted. The next day, defendant received ten private phone calls in a man's voice which she did not recognize. The man said that he would "throw [her] in the trunk of a [vehicle], *** rape [her], *** [and] put something in [her] mouth." She received ten calls a day for the next three days, so she reported them. On October 25, 2021, defendant missed a court date with respect to the order of protection because she discovered that the father of her child passed away. The order of protection, thus, lapsed.

¶ 26        On October 31, 2021, defendant used Joseph's vehicle to go grocery shopping and picked up Joseph and a friend of her child's father to help her take the groceries to her apartment. When she arrived at her building's alley, she heard Kailah screaming, "b***, I found you, I found you." When defendant exited her vehicle, Kailah, Harrison, and Kenneth walked toward her. Defendant asked Kenneth why Kailah kept going to her apartment to fight her, to which Kenneth "shrugged." Harrison said, "pop her," then Kailah reached behind her back with her left hand, so defendant believed Kailah was going to shoot her. Defendant then panicked, retrieved a firearm, and shot her. She was also "concern[ed]" about Kenneth and Harrison, who both ran toward her after she discharged the firearm. After the shooting, she fled.

¶ 27        On cross-examination, defendant stated that she was not at her apartment when it was ransacked, so she did not know who did it. Defendant also did not know who threatened her by phone. The harassment lasted approximately six weeks. The calls decreased in frequency over time to approximately three calls a week. Between the time defendant ended her relationship with Kenneth and the date of the shooting, she saw Kailah once and did not see defendant at all.

¶ 28        On October 31, 2021, Kailah walked quickly toward defendant and began reaching behind her after Harrison said, "pop her," at which point defendant shot her. Defendant did not see Kailah, Kenneth, and Harrison with weapons that day. Defendant denied shooting "directly" at Kenneth and stated that she was afraid when she discharged her firearm.

¶ 29        Defendant introduced a stipulation that Kenneth did not report to police officers that he told Kailah to "come back here" during the incident.

¶ 30        The court instructed the jury regarding the elements of attempted first degree murder using Illinois Pattern Jury Instruction (IPI), Criminal, 6.05X (approved Oct. 17, 2014), which states in relevant part: "[a] person commits the offense of attempt first degree murder when she, without

lawful justification and with the intent to kill an individual, does any act which constitutes a substantial step toward the killing of an individual." Defense counsel did not object or offer an alternative instruction. The court also instructed the jury regarding first degree murder, second degree murder with imperfect self-defense as a mitigating factor, and self-defense.

¶ 31     The jury found defendant guilty of the attempted first degree murder of Kenneth with a firearm and the second degree murder of Kailah.

¶ 32     Defense counsel filed a motion for judgment notwithstanding the verdict, arguing, *inter alia*, that the jury's verdict was against the manifest weight of the evidence because the State failed to prove her guilt beyond a reasonable doubt. Defense counsel also filed a notice of intent to request that defendant's attempted murder conviction be sentenced as a Class 1 felony pursuant to 720 ILCS 5/8-4(c)(1)(E) (West 2020). Defense counsel argued that defendant was acting under a sudden and intense passion resulting from serious provocation by Kenneth.

¶ 33     After a hearing, the court denied defense counsel's motion for a judgment notwithstanding the verdict, finding that the jury considered all facts in evidence and found defendant guilty of second degree murder. The court noted that the jury believed "at least some of the mitigation" that was presented.

¶ 34                                     C. Sentencing

¶ 35     The matter proceeded to a sentencing hearing where defendant's Presentence Investigative Report (PSI) established that defendant had been convicted once of driving under the influence of alcohol but had no other convictions. Defendant had a close relationship with her parents and older brother; however, her mother "put her out of the house at a young age" and the Department of Children and Family Services (DCFS) was involved "on and off" throughout her childhood. Defendant attended high school through the tenth grade and procured her high school equivalency

diploma in 2023. Defendant also "obtained 90 certificates," took "two college Theology classes," and obtained nursing certificates during her incarceration. Prior to the incident, defendant was employed for three years driving for Lyft and Uber.

¶ 36        Defendant had three children, aged 14, 12, and 10, and she "signed for her children to be under subsidized guardianship" when defendant was 20 years old. Defendant had daily contact with her two oldest children but had not seen her youngest child in three years. Defendant's oldest son, who lived with defendant's mother, was in "counseling" and was having a "difficult time" due to her incarceration. Defendant had been prescribed medication for depression in 2021 and had previously been diagnosed with "anxiety and abandonment issues." Defendant had prior "drinking issues" and after completing treatment programs, refrained from drinking. Defendant last used marijuana in 2021, prior to being arrested.

¶ 37        Eve Bledsoe Wimberly testified on behalf of the State that she was Kailah's mother. Wimberly read a statement to the court wherein she addressed Kailah's childhood. Wimberly testified that she struggled with depression and Kailah eventually began to be interested in finding Kenneth, who had "completely disengaged" when Kailah was four years old. Wimberly testified that although Kailah was "cantankerous," she was not menacing in such a way that she deserved her fate. Wimberly discussed how her life changed due to her being a parent to Kailah and discussed how Kailah's murder affected her. She asked that the court consider how acts of violence can affect communities. Wimberly hoped that the court's verdict could "restrain [defendant's] heartlessness from lynching another Kailah." She stated that she believed the jury "got it wrong" but requested that the court not "spare" defendant.

¶ 38        For the defense, Latrisha Washington, defendant's mother, testified that defendant was "[l]oving, kind, [and] helpful," and had not caused "trouble" since her arrest. Washington informed the court that defendant was "pretty much all she [had]."

¶ 39        Laticia Thomas, defendant's aunt, read a statement to the court seeking leniency on behalf of defendant. According to Thomas, defendant was a "loving mother, a cherished family member, and a woman of deep faith." Thomas described the "profound impact" that defendant's incarceration would have on her children.

¶ 40        Marshaun Kuykendoll, defendant's oldest son, read a statement to the court describing defendant as "lovable, kind, and caring," and stating that he loved and missed her. Kuykendoll commented that he "never really spent enough time with [defendant] for this stuff to happen to her."

¶ 41        Defense counsel also tendered a letter from Olivia Soja, defendant's case manager. This letter, which is in the record on appeal, describes defendant's accomplishments in custody. Soja stated that she "rarely" provided such letters to the court, except when an individual "has particularly excelled in programming and made persistent positive choices during their time in custody," as defendant had. Defendant maintained a "positive and focused mindset" during her incarceration, participated in many programs including obtaining her high school equivalency diploma, and worked in areas that she accessed through her positive behavior. In particular, defendant was "housed" on the " 'RESTORE' Program Tier," which was "an opportunity for a small group of women who remain disciplinary free, contribute positively to a living environment, and 'seek to participate in programs/activities that would help them make positive life changes.' " Soja attached a breakdown of defendant's time in programs and work positions, which calculated that defendant had participated 711 days in the RESTORE Program, 154 days in high school

equivalency classes and testing, and 165 days in work positions since May 29, 2024, in addition to various other certificates and programs defendant earned during her incarceration.

¶ 42        In aggravation, the State emphasized that defendant "acted in a callous manner," as was apparent from the recording of the incident. It argued that the video showed that Kailah did not "rush" toward defendant, and she and defendant fought verbally before defendant removed a firearm from the vehicle to shoot Kailah. The State commented that the jury believed that self-defense did not apply with regard to defendant's actions toward Kenneth, and if it did, it would have found her not guilty of attempted murder. It argued that defendant should not be sentenced as a Class 1 offender with respect to the attempted murder, because the shooting was not accidental and defendant was not acting "under a sudden and intense passion resulting from previous provocation." The State requested the maximum sentence for second degree murder, and a "substantial" sentence for the attempted murder of Kenneth.

¶ 43        Defense counsel argued in mitigation that defendant's attempted murder charge should be sentenced as a Class 1 felony because she had previously received multiple threatening phone calls daily and had heard Kailah's threats. Immediately prior to the shooting, she asked Kenneth, "why does your daughter want to fight me?" Defense counsel contended that if defendant shot in Kenneth's direction, she did so because she was afraid of him, and the record established that she acted while under an "intense passion." Defense counsel also emphasized the mitigating evidence, including Soja's report regarding defendant's incarceration and defendant's lack of criminal history. He commented that the case was "one of the most highly provoked crimes" he'd seen during his career.

¶ 44        Defendant read a statement to the court in allocution, apologizing to Kailah's family and commenting that she was "heartbroken" over the events. She stated that she was afraid during the

incident and "did not know how to handle" it. She "sincerely apologize[d]" and expressed the desire that they "could have all gotten help" in order to avoid the situation. She also stated that she had contacted the police previously and they did not assist her, and she was a victim in the matter as well. She described her progress during incarceration, including receiving 111 certificates in programs, and commented that she was "the only female detainee *** since 2021" who received her high school equivalency diploma.

¶ 45     The court sentenced defendant to consecutive terms of 26 years' imprisonment for attempted first degree murder inclusive of a 20-year firearm enhancement, and 10 years' imprisonment for second degree murder. In ruling, the court commented that no factors established "serious provocation" with respect to Kenneth, as he was not "coming at" her, but rather moving toward Kailah as defendant discharged the firearm. The court noted that the jury believed serious provocation existed as to Kailah, however. The court stated that it considered the PSI, and all the factors in aggravation and mitigation as well as the facts of the case, which it considered to be aggravating. It specified that it considered the mitigation, including defendant's lack of criminal history which it found "quite mitigating," and her rehabilitative potential. The court expressed its belief that defendant obtained an order of protection due to a dispute regarding a vehicle and stated that Kailah "was trying to protect her father for some reason about the [vehicle]." It noted that defendant chose to arm herself with a firearm, which she discharged multiple times during the incident. The court denied defendant's motion to reconsider her sentence.

¶ 46                                    II. ANALYSIS

¶ 47                          A. Attempted First Degree Murder

¶ 48     On appeal, defendant argues that her trial counsel was ineffective for failing to object to the trial court's jury instruction regarding attempted first degree murder where it did not specify

that correct mental state: intent to kill without lawful justification. She also contends that the State failed to prove her guilty of attempted first degree murder because it did not establish that she attempted to kill Kenneth without lawful justification, and the trial court erred in not sentencing the attempted first degree murder as a Class 1 offense where the evidence established that she was "acting under a sudden and intense passion resulting from serious provocation."

¶ 49      As we find that defendant's claim regarding the trial court's use of an incorrect jury instruction to be determinative, we address that issue first.

¶ 50      1. Forfeiture

¶ 51      Initially, we note that defendant did not preserve a challenge to the trial court's jury instruction at trial but requests review of the issue due to trial counsel's ineffectiveness for failing to object to the instruction. Alternatively, defendant requests that we review the issue under the plain error doctrine.

¶ 52      "An ineffective assistance of counsel claim requires a defendant to establish both that counsel's performance fell below an objective standard of reasonableness and that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Bush*, 2023 IL 128747, ¶ 79 (internal quotation marks omitted.). "It is well settled in Illinois that counsel's choice of jury instructions, and the decision to rely on one theory of defense to the exclusion of others, is a matter of trial strategy." *People v. Sims*, 374 Ill. App. 3d 231, 267 (2007). Counsel's decision regarding the tendering of jury instructions can support a claim of ineffective assistance "only if that choice is objectively unreasonable." *Id*.

¶ 53      Here, defense counsel did not object to the longstanding IPI instruction for attempted first degree murder. We cannot find defense counsel ineffective for failing to foresee that, subsequent to defendant's trial, our supreme court would find the instruction at issue facially defective because

it did not correctly state the *mens rea* element of the offense, especially where defendant's mental state regarding Kenneth remains in dispute. *Contra People v. Guy*, 2025 IL 129967, ¶¶ 67, 70 (finding trial counsel ineffective for failing to object and offer an alternative attempted first degree murder instruction where the jury found that the defendant believed he was justified in the shooting). Having found that trial counsel was not ineffective for failing to object to the attempted murder jury instruction, we find this error reviewable under the plain error doctrine. See *People v. Davis*, 145 Ill. 2d 240, 251 (1991) (failure to raise an issue on appeal does not preclude the court's consideration of it under the plain error doctrine).

¶ 54    Forfeited errors may also be reviewed under the plain error doctrine, which " 'allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence.' " *People v. Glasper*, 234 Ill. 2d 173, 203 (2009). "The failure correctly to [sic] inform the jury of the elements of the crime charged has been held to be error so grave and fundamental that the waiver rule should not apply." *People v. Ogunsola*, 87 Ill. 2d 216, 222 (1981); see *People v. Thompson*, 2026 IL App (1st) 231564-U, ¶¶ 25-29; *People v. Jones*, 2025 IL App (1st) 221555-U, ¶ 13, *pet. for leave to appeal allowed*, No. 132710 (filed May 27, 2026) (finding the use of the incorrect jury instruction for attempted first degree murder reviewable under second prong plain error).

¶ 55                                2. Jury Instruction Error

¶ 56    Attempted first degree murder requires the State to prove that "(1) defendant performed an act constituting a substantial step toward the commission of murder, and (2) defendant possessed the criminal intent to kill the victim." *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52; 720 ILCS 5/8-4(a), 9-1(a)(1) (West 2020). Attempted murder is a specific intent crime, so the State

must prove the defendant had the specific intent to kill. *Viramontes*, 2017 IL App (1st) 142085, ¶ 52.

¶ 57      In *People v. Guy*, 2025 IL 129967, our supreme court clarified that "[a] defendant who subjectively believes in the need for self-defense cannot be convicted of attempted first degree murder because the defendant would not have the specific intent to commit first degree murder." *People v. Guy*, 2025 IL 129967, ¶ 47. "When the jury is instructed on justification, the phrase 'without lawful justification' describes the defendant's *use of force*, not the defendant's *intent* or belief." (Emphasis in original.) *People v. Thompson*, 2026 IL App (1st) 231564-U, ¶ 24 (citing *id*.) (describing IPI Criminal Nos. 6.05X, 6.07X).

¶ 58      Here, the jury was instructed using IPI Criminal No. 6.05X, which does not accurately state the *mens rea* of the charged offense. See *Guy*, 2025 IL 129967, ¶ 66. As in *Ogunsola*, the jury was not instructed on an essential element of the offense, the intent element of attempted first degree murder. *Ogunsola*, 87 Ill. 2d at 221-22 (finding second prong plain error where the jury was not instructed regarding the intent to defraud as an essential element of the offense of deceptive practices). We, therefore, conclude that the erroneous instruction satisfies the second prong of the plain error doctrine. See *Glasper*, 234 Ill. 2d at 203.

¶ 59      The State nevertheless contends that we may not review the jury instruction issue under second prong plain error because instructional errors are not "structural" as they "are deemed harmless if it is demonstrated that the result of the trial would not have been different had the jury been properly instructed." See *People v. Washington*, 2012 IL 110283, ¶¶ 59-60 (failure to instruct a jury on second degree murder where the court has given an instruction on self-defense was not "structural" error). Here, however, the jury was not instructed on an essential element of the offense of attempted first degree murder, the *mens rea* of the offense. This defective instruction

"allowed the jury to convict [the] defendant on a legally improper basis: a sincere but unreasonable belief in the need for defensive force." See *Thompson*, 2026 IL App (1st) 231564-U, ¶ 29.

¶ 60   The State additionally contends the error is harmless because the evidence established that defendant "was the initial aggressor, the victims were unarmed[,] and the evidence shows she had the intent to kill both Kailah and Kenneth." However, the jury found sufficient evidence in support of defendant's unreasonable belief in the need for self-defense against Kailah to warrant a second degree murder conviction. Given the facts of the case, it is possible that a jury could find that defendant had an unreasonable but subjective belief in the need to use defensive force against Kailah but not against Kenneth. Mere possibility is insufficient. We cannot conclude that the jury evaluated defendant's intent in this manner, as the record contains no support for the assertion that the jury considered defendant's *mens rea* with respect to her self-defense claim against Kenneth. Thus, a genuine question of fact, appropriate for the jury to resolve, exists regarding defendant's subjective belief in her need for defensive force against Kenneth.

¶ 61   Accordingly, we vacate defendant's attempted murder conviction and remand for a new trial to allow the trial court to properly instruct the jury and for the parties to present evidence and argument related to the new construction of the law. See *People v. Ramirez*, 2023 IL 128123, ¶ 31 (remanding for a new trial where the State would have the opportunity to prove defendant's knowledge under the new construction of the law). The double jeopardy clause does not bar retrial where, as here, "a conviction is reversed because of a posttrial change in law." *People v. Casler*, 2020 IL 125117, ¶ 57.

¶ 62   As we vacate defendant's attempted murder conviction and remand the matter for a new trial on the issue, we need not address defendant's alternate arguments that the evidence was

insufficient to support attempted first degree murder and the trial court erred in sentencing it as a Class X offense.

¶ 63                              B. Second Degree Murder

¶ 64          Defendant also contends that the State did not prove the second degree murder of Kailah beyond a reasonable doubt because it did not disprove that defendant reasonably believed that she needed to use deadly force to protect herself from Kailah, and her sentence is excessive where the court did not adequately consider the mitigating evidence.

¶ 65                              1. Sufficiency of the Evidence

¶ 66          The standard of review for a challenge to the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks and emphasis omitted.) *People v. Belknap*, 2014 IL 117094, ¶ 67. The trier of fact resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from basic facts to ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. Accordingly, this court will not retry the defendant or substitute its judgment for that of the trier of fact on the weight of the evidence or credibility of witnesses. *Id*. A reviewing court must allow all reasonable inferences from the record in favor of the prosecution (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)) and will not reverse a conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." ((Internal quotation marks omitted.) *People v. Jackson*, 232 Ill. 2d 246, 281 (2009)).

¶ 67          Second degree murder is a lesser mitigated, not a lesser included, offense of first degree murder. *People v. Jeffries*, 164 Ill. 2d 104, 122-23 (1995). The elements of the two offenses are

identical, but the presence of a statutory mitigating factor reduces unlawful homicide from first degree murder to second degree murder. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 153.

¶ 68    Section 9-2 of the Criminal Code of 2012 provides for two forms of second degree murder. *Id.* ¶ 148; 720 ILCS 5/9-2 (West 2020). Relevant here is the second form, which occurs when: "at the time of the killing [the offender] believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable." 720 ILCS 5/9–2(a)(2) (West 2020). Known as imperfect self-defense, this form of second degree murder "occurs when there is sufficient evidence that the defendant believed [she] was acting in self-defense, but that belief is objectively unreasonable." *Castellano*, 2015 IL App (1st) 133874, ¶ 148 (quoting *Jeffries*, 164 Ill. 2d at 113).

¶ 69    Self-defense is legal justification for first degree murder. *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 54. "A person is justified in the use of force against another when and to the extent that [she] reasonably believes that such conduct is necessary to defend [herself] or another against such other's imminent use of unlawful force." 720 ILCS 5/7-1(a) (West 2020).

> "Self-defense includes the following elements: (1) unlawful force threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied, and (6) the beliefs of the person threatened were objectively reasonable." *People v. Gray*, 2017 IL 120958, ¶ 50.

¶ 70    If the State negates any element of self-defense, the self-defense claim fails. *Id.* The trier of fact may then consider whether the defendant is guilty of second degree murder, *i.e.*, whether a mitigating circumstance existed. *People v. Spiller*, 2016 IL App (1st) 133389, ¶¶ 29-30. Whether

a mitigating circumstance existed is a question of fact. *People v. Bennett*, 2017 IL App (1st) 151619, ¶ 43. Although the burden of proof remains with the State to prove beyond a reasonable doubt each element of first degree murder and the absence of mitigating circumstances, it is defendant's burden to prove a mitigating factor by a preponderance of the evidence. 720 ILCS 5/9-2(c) (West 2016). "The determination of whether a defendant is guilty of first degree murder or guilty of second degree murder or was justified because acting in self-defense is a question for the finder of fact." *People v. Simon*, 2011 IL App (1st) 091197, ¶ 52.

¶ 71    Viewing the evidence in the light most favorable to the State, a rational trier of fact could find that defendant did not prove that she acted in self-defense during the encounter. Here, the State presented evidence that defendant shot Kailah as she walked toward her during a disagreement and, thus, defendant was the initial aggressor. Kailah was unarmed. Video footage confirmed that defendant shot Kailah as she approached, and Kailah did not draw a weapon or attack defendant. A rational trier of fact could have found that defendant's belief that Kailah presented a danger necessitating the use of deadly force was objectively unreasonable, and so defendant did not establish that she acted in self-defense. See *Castellano*, 2015 IL App (1st) 133874, ¶ 148.

¶ 72    Defendant nevertheless contends that the State did not disprove that defendant reasonably believed that she needed to use deadly force against Kailah. Defendant argues that Kailah and Kenneth's prior threats against defendant, combined with Kailah, Kenneth, and Harrison's words and actions on the date of the incident, establish that defendant reasonably feared for her life.

¶ 73    The jury considered the evidence presented by defendant and ultimately determined that her subjective belief in the need to use deadly force against Kailah was objectively unreasonable. As the reviewing court, we must not substitute our judgment for that of the jury. See *Brown*, 2013

IL 114196, ¶ 48, see also *Simon*, 2011 IL App (1st) 091197, ¶ 52. Although defendant presented evidence that she had been threatened by Kailah and feared her, the State presented evidence, corroborated by footage of the entire incident, that Kailah was unarmed and not physically aggressive toward defendant. "The trier of fact is free to accept or reject as much or as little of a witness's testimony as it pleases." *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67. Defendant additionally fled the scene after the shooting, which could express a guilty state of mind and knowledge that she did not act in reasonable self-defense. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 59 ("[e]vidence of flight *** is competent circumstantial evidence that refutes the theory that [the] defendant acted in self-defense"). A rational jury could, thus, conclude that defendant's actions in shooting Kailah were objectively unreasonable. See *Castellano*, 2015 IL App (1st) 133874, ¶ 148.

¶ 74    Taking all the evidence in the light most favorable to the State, a jury could have reasonably concluded that defendant's belief in the need to employ deadly force against Kailah was objectively unreasonable. As the evidence is not so "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt," we affirm her conviction for second degree murder. See *Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 75                                  2. Excessive Sentence

¶ 76    As a final matter, defendant contends that her sentence for second degree murder is excessive because the court failed to adequately consider the evidence in mitigation. Defendant contends that the trial court did not sufficiently consider the unique circumstances of the case, including the jury's finding of "serious provocation" with regard to Kailah, defendant's lack of criminal history, and her rehabilitative potential.

¶ 77　　A sentence should reflect both the seriousness of the offense and the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I § 11; *People v. Neasom*, 2017 IL App (1st) 143875, ¶ 48. A sentencing court's decision is reviewed for abuse of discretion. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A court abuses its discretion where the sentence is " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Id*. (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)). The court has broad discretion in imposing a sentence and is afforded great deference because the judge "observed the defendant and the proceedings" and is better positioned to weigh the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Id*. at 212-13. The reviewing court " 'must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently.' " *Id.* at 213 (quoting *Stacey*, 193 Ill. 2d at 209).

¶ 78　　While a trial court must consider all factors in aggravation and mitigation, the seriousness of the offense, rather than the mitigating evidence, is the most important factor in sentencing. *People v. Kelley*, 2015 IL App (1st) 132782, ¶ 94. The trial court is presumed to consider "all relevant factors and any mitigation evidence presented" (*People v. Jackson*, 2014 IL App (1st) 123258, ¶ 48) but has no obligation to recite and assign a value to each factor (*People v. Perkins*, 408 Ill. App. 3d 752, 763 (2011)). Rather, the defendant must affirmatively show that the court did not consider the relevant sentencing factors. *People v. Kindle*, 2021 IL App (1st) 190484, ¶ 67.

¶ 79　　A sentence within the statutory range is presumed to be proper. *People v. Villalobos*, 2020 IL App (1st) 171512, ¶ 73. Here, defendant was convicted of second degree murder, with a sentencing range of 4 to 20 years' imprisonment. 730 ILCS 5/5-4.5-30(a) (West 2020). Her 10-

year sentence is within this statutory guideline and is, therefore, presumed to be proper. *Villalobos*, 2020 IL App (1st) 171512, ¶ 73.

¶ 80    Further, defendant's claim that the trial court failed to properly consider the enumerated mitigating factors lacks support in the record. In pronouncing sentence, the trial court stated that it reviewed the relevant factors in mitigation and aggravation, and defendant points to no evidence outside the length of her sentence in support of her claim that the trial court did not weigh the mitigating factors appropriately. The trial court was not obligated to reduce her sentence merely due to the presence of mitigating factors. See *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19.

¶ 81    Here, defendant shot Kailah's face twice and shot in the direction of Kenneth, after Kailah, Kenneth, and Harrison approached her in an alley. The court commented that defendant chose to arm herself with a firearm which she discharged multiple times against the victims, and the record contains no evidence to establish that the victims were armed. Defendant then fled the scene. As noted, the seriousness of the offense is the most important factor in sentencing. *Kelley*, 2015 IL App (1st) 132782, ¶ 94. Under these facts, a court could have reasonably concluded that defendant's actions were egregious enough to warrant a sentence above the minimum. Defendant has failed to meet her burden to affirmatively show that the court did not adequately consider all relevant factors during sentencing. See *Kindle*, 2021 IL App (1st) 190484, ¶ 67. As the sentence is not manifestly disproportionate to the nature of the offense, the court did not abuse its discretion in sentencing defendant. See *Alexander*, 239 Ill. 2d at 212. We, thus, affirm defendant's sentence of 10 years' imprisonment for second degree murder.

¶ 82                                  III. CONCLUSION

¶ 83     For the foregoing reasons, we affirm defendant's conviction and sentence for second degree murder. We reverse and remand for a new trial regarding defendant's attempted first degree murder charge.

¶ 84     Affirmed in part; reversed and remanded in part.